Webster v. State.

Roy Webster *et al. v.* State.

*(Jackson.  April Term, 1903.)*

1. **CONSTITUTIONAL LAW.** Statutes prohibiting sales of intoxicating liquors except by manufacturers in wholesale packages or quantities are constitutional.

Our statutes, known as the Four Mile Law, with its amendments (Acts 1877, ch. 23, Acts 1887, ch. 167, Acts 1899, ch. 221, and Acts 1903, ch. 2), prohibiting the sale of intoxicating liquors in this State, except in certain incorporated cities, are not unconstitutional as class legislation, because they except from their operation sales by manufacturers of such liquors in wholesale packages or quantities. This exemption is operative in favor of manufacturers only when they sell in wholesale quantities or in packages, or quantities designed and suitable for purpose of trade, and to be sold again, and not to sales to persons for consumption or as retailers, though the sales may be made by manufacturers. *(Post,* 495-507.)

·Cases cited and approved: State v. Rauscher, 1 Lea, 97; Hatcher v. State, 12 Lea, 368; Moore v. State, 96 Tenn., 544; Harrison v. State, 96 Tenn., 548; State v. Frost, 103 Tenn., 686; Brinkley v. State, 108 Tenn., 476; Reymann Brewing Company v. Brister, 179 U. S., 445; Adler v. Whitbeck, 44 Ohio St., 574.

Statutes cited and construed:  Acts 1877, ch. 23; Acts 1887, ch. 167; Acts 1899, ch. 221; Acts 1903, ch. 2.

:2. **SAME.** Same. Statutes regulating, restricting and prohibiting manufacture and sale of intoxicating liquors under police powers are constitutional.

·The traffic in intoxicating liquors is universally recognized as a proper subject for police regulation, and may be controlled, restricted, or even totally prohibited under the police power, without violating any constitutional right. It is for the legislature to decide when the exigency exists for the exercise of the police power in the regulation, restriction and even prohibition of .liquor traffic, and its exercise is not controlled by the courts.

The exercise of this power with respect to the manufacture and sale of intoxicating liquors, even to the extent of abolishing them, is not a denial of an equal protection of the law, nor a violation of the fourteenth amendment to the constitution of the United States. (*Post, pp.* 504-506.).

Cases cited and approved: Theilan v. Porter, 14 Lea, 626; Boston Beer Company v. Massachusetts, 97 U. S., 25; Bartemeyer v. Iowa, 18 Wall., 129; Mugler v. Kansas, 123 U. S., 623; Powell v. Pennsylvania, 127 U. S., 683; Munn v. Illinois, 94 U. S., 113; Kidd v. Pearson, 128 U. S., 1; Crowley v. Christensen, 137 U. S., 86; Miller v. Ammon, 145 U. S., 421; Gray v. Connecticut, 159 U. S., 74; Foster v. Kansas, 112 U. S., 205; Eilenbecker v. Plymouth Company, 134 U. S., 31; License Cases, 5 How., 504; Giozza v. Tiernan, 148 U. S., 657.

Constitution of United States cited and construed: 14 Amend.

3. **SAME.** Same. Same. What may be done by legislation under police power.

The police power of the government is a power, the proper exercise of which is essential to the safety and tranquility of every well ordered community. This police power extends over a large range of subjects, namely: the public health, the public morals, the public safety, and the public welfare, under any one of which the regulation and restriction of the sale of intoxicating liquors would readily fall. The courts have wisely refrained from prescribing limits to the exercise of the police power by the government. The police power embraces all such legislation as will preserve and promote the public welfare by prohibiting all hurtful things to the comfort, safety and welfare of society, and the establishment of such rules and regulations for the conduct of all persons, and the use and management of all property as may be conducive to the public interest. (*Post, pp.* 504-506.)

Cases cited and approved: Theilan v. Porter, 14 Lea, 626; Boston Beer Company v. Massachusetts, 97 U. S., 25; Bartemeyer v. Iowa, 18 Wall., 129; Mugler v. Kansas, 123 U. S., 623; Powell v. Pennsylvania, 127 U. S., 683; Munn v. Illinois, 94 U. S., 113; Kidd v. Pearson, 128 U. S., 1; Crowley v. Christensen, 137 U. S., 86;

Webster v. State.

Miller v. Ammon, 145 U. S., 421; Gray v. Connecticut, 159 U. S., 74; Foster v. Kansas, 112 U. S., 205; Eilenbecker v. Plymouth Company, 134 U. S., 31; License Cases, 5 How., 504; Giozza v. Tiernan, 148 U. S., 657.

**4. PRIVILEGES.** License to exercise, granted by State may be revoked by the legislature.

The grant of a privilege to tipple, which might be exercised within an incorporate town, irrespective of its proximity to incorporated institutions of learning, does not include the right to do so upon the repeal of the charter of the town, nor preclude the legislature from repealing the charter of the town, nor change the results of such repeal. (*Post, pp.* 507-509.)

Cases cited and approved: Johnson v. State, 3 Lea, 470; Brinkley v. State, 108 Tenn., 475.

**5. STATUTORY CONSTRUCTION.** Obsolete and inoperative part of statute is not revitalized by amendment, when.

Where a statute prohibiting the sale of intoxicating liquors in towns of two thousand inhabitants or less, subsequently incorporated, but excepting sales made by persons having licenses at the date of the passage of the act, during the time for which such licenses were granted, which period could not exceed one year, is, nearly two years thereafter, amended by striking out the word "two" and inserting therefor the word "five" so as to extend the provisions thereof to towns of five thousand inhabitants or less, subsequently incorporated, the amendment does nor re-enact or revitalize the provisions of the former act excepting from its operation sales made under licenses in force at the time of the passage thereof. The said exception expired by its own limitation when the licenses then existing terminated, and became dead and obsolete law, and was so at the passage of the amending law and did not become incorporated into it nor resuscitated by it. (*Post, pp.* 509-511.)

Statutes cited and construed: Acts 1899, ch. 221; Acts 1903, ch. 2.

**6. CRIMINAL LAW.** Wholesale liquor dealer as aider and abettor is equally guilty with the retail liquor dealer for the violation of the law, where the offense is a misdemeanor, when.

Where a saloon was opened and intoxicating liquors were sold in

violation of the law, and a wholesale dealer, who was the instigator of the entire matter, and who encouraged and induced the nominal owner thereof to enter into the business, and who, or his firm, furnished the money to conduct it, and sold him his stock of liquors, and who went with the saloon keeper to the mayor of the city to make negotiations to be allowed to engage in the business, and failing in that, notified the mayor that they would commence selling liquors, and was present in and about the saloon when the illegal sales were made, and was in fact. the chief beneficiary of the business, is equally guilty with the saloon keeper, in whose name the sale was made. He was an aider and abettor, and guilty of the misdemeanor as a principal.. (*Post, pp.* 511-513.)

## FROM OBION.

Appeal in error from the Circuit Court of Obion County.—R. E. MAIDEN, Judge.

LEHMAN & LEHMAN, WRIGHT, PETERS & WRIGHT, OWNBY & KELLER and H. C. TRUE, for Webster *et al.*

ATTORNEY-GENERAL CATES, MOORE & WELLS, OWEN & SMITH, for the State.

MR. JUSTICE WILKES delivered the opinion of the Court.

Defendants are convicted of unlawfully tippling intoxicating liquors within four miles of a schoolhouse,

and sentenced to pay a fine of $50 each and to suffer imprisonment for 60 days in the county jail; and they have appealed.

There was a motion to quash the indictment in the court below upon the grounds that the act of the general assembly of 1903, under which this indictment was based, was void, (1) because the act and those it amends are vicious class legislation, in that manufacturers are exempt from their operation and permitted to sell intoxicating liquors at wholesale within the prescribed limits, and (2) because the acts violate the fourteenth amendment of the constitution of the United States, in denying to all citizens the equal protection of the law.

The motion to quash was overruled, and the cause was heard upon its merits before the court and a jury, with the result as stated; and the defndants have appealed and assigned errors.

The facts, so far as necessary to be stated, are that previous to January 26, 1903, W. R. Webster, the brother of defendant Roy Webster, had been for several years engaged in the retail liquor business at the White Oak saloon in Union City, Tenn.; that he had been in the habit of taking out his license quarterly; that on the 26th of January, 1903, he had an unexpired license taken out shortly before that date, and having nearly three months to run; that on that date he went to the office of the county court clerk of Obion county, at Union City, and procured a license to be issued in the

name of Roy Webster, or R. L. Webster, one of the defendants herein, to run for the period of one year from that date, and paid therefor the license tax due the State and county.

It was further shown that there was no apperent change in the business carried on at the White Oak saloon; that W. R. Webster continued in business there until the 31st of March, 1903, when an act was passed by the legislature, which then took effect, repealing the charter of Union City, and thereupon no further business was done at the saloon until the 17th of April, 1903, when the sale on which this indictment is predicated was made.

It also appears that up to the date of trial, W. R. Webster had not settled and paid his *ad valorem* taxes to the county court clerk under his original license.

On the 16th of April, 1903, Roy Webster commenced to do business at this saloon. The defendants testified in the case for themselves. Defendant Roy Webster stated that on the 26th of January, 1903, he bought out the business of his brother, W. R. Webster, and took out a license for the full year in his own name, and that thereafter the business was carried on at the White Oak saloon was his own, and not that of his brother; that he closed said business March 31, 1903, and did not reopen until April 16, 1903; that he procured the money from the firm at Memphis of which his codefendant was a member to buy his license, and that this money was procured by draft for $500 on Heil-

Webster v. State.

bronner's firm, and was cashed 27th of January; that Heilbronner offered Roy Webster to put him into business, and told him that, if he would take out a license for a year, he would furnish him money to pay for the same, and honored the draft in pursuance of his promise, and with the understanding that the liquors would be bought from his firm, though there was no express agreement to that effect. The defendant Heilbronner claimed that his only interest in the business was to sell goods to his codefendant, Webster, and that his firm advanced money to purchase the license as a matter of business, and that thereafter he sold to his codefendant a large amount of goods, on which his firm had been paid considerable sums, and he denied that he was in any way interested in the business, or that he participated in the sale for which he, with his codefendant, was indicted.

It is shown that there was no apparent change in the business between January 26, and March 31, 1903, but that it was understood that W. R. Webster was operating still the business of the White Oak saloon when it was closed on March 31, 1903. It is further shown that on the day before the saloon was reopened on April 16, 1903, both the defendants paid a visit to the mayor of Union City, and endeavored to secure immunity from the municipal authorities, in order that they might test the question and their right to do business in Union City with the State and county author-

ities. It seems that at this conference Heilbronner did most of the talking, and he gave the mayor to understand that he and his codefendant, upon the advice of their attorneys, were going to open business and test the question. The mayor declined to make an agreement with them, and thereupon on the next day the saloon was opened for business and sales made, both of defendants being about the saloon, when they were arrested upon a warrant issued by a justice of the peace and bound over to court. Upon these facts the jury found both defendants guilty.

The legislation drawn in question in these two causes is what is known in Tennessee as the "Four-Mile Law," and originated with chapter 23, p. 37, of the Acts of 1877, which is as follows:

## "CHAPTER 23.

"An act to prohibit the sale of intoxicating liquors near institutions of learning.

"Section 1. Be it enacted by the general assembly of the State of Tennessee, that it shall not, hereafter, be lawful for any person to sell or tipple any intoxicating beverage within four miles of an incorporated institution of learning in this State, and that any one violating the provisions of this act shall be guilty of a misdemeanor, and upon conviction shall be punished by a fine of not less than one hundred dollars, nor more than two hundred and fifty dollars, and imprisoned for a period of not less than one nor more than six months.

"Sec. 2.   Be it further enacted, that this act shall not apply to the sale of such liquors within the limits of any incorporated town, nor to sales made by persons having licenses to make the same at the date of the passage of this act, during the time for which such licenses were granted, nor to sales by manufacturers of such liquors in wholesale packages or quantities.

"Sec. 3.   Be it further enacted, that this act take effect from and after its passage, the public welfare requiring it.

"Passed March 19, 1877."

The constitutionality of this act was attacked, but sustained by this court.   *State* v. *Rauscher,* 1 Lea, 97; *Hatcher* v. *State,* 12 Lea, 368.

The provisions of this original act were extended, so as to prohibit, under certain conditions, sales of liquor as a beverage within four miles of any schoolhouse, public or private, by chapter 167, p. 293, of the Acts of 1887, as follows:

## "CHAPTER 167.

"An act to prohibit the sale of intoxicating liquors as a beverage near any schoolhouse, public or private, where a school is kept, whether the school be in session or not.

"Section 1.   Be it enacted by the general assembly of the State of Tennessee, that it shall not hereafter be lawful for any person to sell or tipple any intoxicating liquors, including wine, ale, and beer, as a beverage,

within four miles of any schoolhouse, public or private, where a school is kept, whether the school be in session or not, in this State, and any one violating the provisions of this act shall be guilty of a misdemeanor, and, upon conviction, shall be punished by a fine for each offense of not less than ten dollars nor more than one hundred dollars, and imprisonment for a period of not more than six months, at the discretion of the court.

"Sec. 2.    Be it further enacted, that this act shall not apply to the sale of such liquors within the limits of any incorporated town, nor to sales made by person having licenses to make the same at the date of the passage of this act during the time for which such licenses were granted, nor to sales by manufacturers of such liquors in wholesale packages or quantities.

"Sec. 3.    Be it further enacted, that all laws in conflict with this act be, and the same are hereby repealed.

"Passed March 23, 1887."

The act of 1887 was enforced by this court in *Moore* v. *State,* 96 Tenn., 544, 35 S. W., 556, and *Harrison* v. *State,* 96 Tenn., 548, 35 S. W., 559.

In 1899 section 2 of chapter 167 of the Acts of 1887 was amended so as to prohibit sales of liquor in towns thereafter incorporated of not more than 2,000 inhabitants by the federal census of 1890, or any subsequent federal census. The act of 1899 is as follows (Acts 1899, p. 474):

"CHAPTER 221 (HOUSE BILL No. 55).

"An act to amend section 2, chapter 167, of the Acts of the general assembly of 1887, to prohibit the sale of

intoxicating liquors as a beverage near any school-house, public or private, where a school is kept, whether the school be in session or not.

"Section 1.  Be it enacted  by the general assembly of the state of Tennessee, that section 2, chapter 167, of the Acts of the general assembly of 1887 be amended so as to read as follows:  'That this act shall not apply to the sale of such liquors within the limits of any incorporated town, except towns hereafter incorporated with a population of not more than two thousand inhabitants by the federal census of 1890, or any other subsequent federal census, nor to sales made by persons having licenses to make the same at the date of the passage of this act, during the time for which such licenses were granted, nor to sales by manufacturers of such liquors in wholesale packages or quantities.'

"Sec. 2.  Be it further enacted, that all laws or parts of laws in conflict with this act be, and the same are hereby repealed, and that this act take effect from and after its passage, the public welfare requiring it.

"Passed April 14, 1899."

The constitutionality of the act of 1899 was attacked, but sustained by this court, in *State* v. *Frost,* 103 Tenn., 686, 54 S. W., 986, and *Brinkley* v. *State,* 108 Tenn., 476, 67 S. W., 796.

There was passed by the general assembly on January 26, 1903, and approved by the governor on February 2, 1903, the following act:

## "SENATE BILL NO. 1.

"An act to amend section 1, chapter 221, of the Acts of the general assembly of 1899 entitled:    'An act to amend section 2, chapter 167, of the Acts of the general assembly of 1887, to prohibit the sale of intoxicating liquors as a beverage near any schoolhouse, public or private, where a school is kept, whether the school be in session or not,' so as to extend the provisions of said chapter 167 of the Acts of the general assembly of 1887 and said section 1, chapter 221, of the Acts of the general assembly of 1899 to towns of not more than five thousand inhabitants hereafter inporated.

"Section 1.   Be it enacted by the general assembly of the State of Tennessee, that section 1, chapter 221, of the Acts of the general assembly of 1899, be amended by striking out the word 'two' in line eight of said section, and inserting therefor the word 'five.'

"Sec. 2.   Be it further enacted that this act shall take effect from and after its passage, the public welfare requiring it.

"Passed January 26, 1903."

It will be seen that each of these several acts (except the act of 1903) has been fully considered by this court, and their constitutionality maintained; and we need not further mention this special feature of the case.

The exact point of criticism made in the first ground of the motion to quash is that the act is invalid, because

partial and not the law of the land, in that manufacturers are exempted from its operation.

It has been held that this exemption is operative in favor of manufacturers only when they sell in wholesale quantities, or in packages or quantities designed and suitable for purposes of trade and to be sold again, and not to sales to persons for consumption, or as retailers, though the same may be a manufacturer. *Harrison* v. *State,* 96 Tenn., 548, 35 S. W., 559.

And a fraudulent evasion of the law would not protect the manufacturer who in fact sold by the quantity, but for the purpose of its being consumed among the indirect purchasers. And it was held that the distinction between the wholesale and retail dealer did not depend upon the amount sold, but whether sold to be consumed, or in the regular course of trade to be resold again.

We will consider the question from the standpoint of sales made in good faith by *bona fide* manufacturers and for the purpose of resale by the purchasers in smaller quantities. And the question is: Does the exemption of maufacturers from the operation of the law make it invalid? or is the distinction based upon valid, legal, and constitutional grounds and reasons?

And this also presents the question whether such a discrimination between wholesale and retail dealers of whisky is contrary to the provisions of the constitu-

tion of the United States and the fourteenth amendment thereof.

From the infancy of our governments, State and national, the regulation of the traffic in and the use of intoxicating liquors has been the subject of special and continued legislation.

This legislation has been based upon what is known as the "police power" of the government —a power the proper exercise of which has been said by this court to be essential to the safety and tranquility of every well-ordered community. *Theilan* v. *Porter,* 14 Lea, 626, 52 Am. Rep., 173. This police power extends over a large range of subjects—the public health, the public morals, the public safety, the public welfare—under any one of which the regulation and restriction of the sale of intoxicating liquors would readily fall. The courts have wisely refrained from prescribing limits to the exercise of the police power by the government; and it has held to embrace all such legislation as will preserve and promote the public welfare by prohibiting all things hurtful to the comfort, safety, and welfare of society, and the establishing of such rules and regulations for the conduct of all persons, and the use and management of all property, as may be conducive to the public interest. 22 Am. & Eng. Ency. Law (2 Ed.), p. 916, and cases cited.

The traffic in intoxicating liquors is universally recognized as a proper subject for police regulation, and may be controlled, restricted, or even

Webster v. State.

totally prohibited, without violating any constitutional right under the police power.    Id., p. 927, and cases cited; *Boston Beer Co.* v. *Massachusetts,* 97 U. S., 25, 24 L. Ed., 989; *Bartemeyer* v. *Iowa,* 18 Wall., 129, 21 L. Ed., 929; *Mugler* v. *Kansas,* 123 U. S., 623, 8 Sup. Ct., 273, 31 L. Ed., 205.

The regulation, restriction, and even prohibition of the liquor traffic being clearly within the police power of the State, it is for the legislature to decide when the exigency exists for the exercise of that power, and its exercise is not to be controlled by the courts. *Powell* v. *Pennsylvania,* 127 U. S., 683, 8 Sup. Ct., 992, 32 L. Ed., 253 (Rose's Notes).

And the exercise of this power with respect to the manufacture and sale of intoxicating liquors, even to the extent of abolishing them, is not a denial of an equal protection of the law, nor a violation of the fourteenth amendment to the constitution of the United States.    *Cooley's Constitutional Limitations,* 720; *Munn* v. *Illinois,* 94 U. S., 113, 24 L. Ed., 77; *Mugler* v. *Kansas,* 123 U. S., 623, 8 Sup. Ct., 273, 31 L. Ed., 205; *Kidd* v. *Pearson,* 128 U. S., 1, 9 Sup. Ct., 6, 32 L. Ed., 346; *Crowley* v. *Christensen,* 137 U. S., 86, 11 Sup. Ct., 13, 34 L. Ed., 620; *Miller* v. *Ammon,* 145 U. S., 421, 12 Sup. Ct., 884, 36 L. Ed., 759; *Gray* v. *Connecticut,* 159 U. S., 74, 15 Sup. Ct., 985, 40 L. Ed., 80; *Bartemeyer* v. *Iowa,* 18 Wall., 129, 1 L. Ed., 929; *Foster* v. *Kansas,* 112 U. S., 205, 5 Sup. Ct., 8, 97, 28 L. Ed., 629; *Eilenbecker* v. *Plymouth Co.,* 134 U. S., 31, 10 Sup. Ct., 424, 33 L. Ed., 801; *License Cases,* 5 How., 504, 12 L. Ed.,

256; *Giozza* v. *Tiernan*, 148 U. S., 657, 13 Sup. Ct., 721, 37 L. Ed., 599.

This power of regulation and restriction may be, and usually is, exercised by means of licenses as a condition to selling liquors; and the legislature may not only prescribe the conditions upon which such licenses will be granted, but may also regulate the conduct of the business after the license had been granted. See cases cited and illustrations in 17 Am. & Eng. Ency. Law, p. 209.

And the legislature may, for proper cause shown, revoke such license. Id., p. 215.

The fact that manufacturers are not subject to the provisions of the act, when they sell in wholesale packages or quantities, does not render the act invalid or unconstitutional. *Reymann Brewing Co.* v. *Brister*, 179 U. S., 445, 21 Sup. Ct., 201, 45 L. Ed., 269. As was said in *Adler* v. *Whitbeck*, 44 Ohio St., 574, 9 N. E., 682: "It was for the legislature to determine the form of the traffic that required to be regulated as a source of evil. It has in a measure drawn a line between a distillery and a brewery on the one hand, and a saloon on the other. There is nothing unreal in this distinction. It is known by all men, and in one respect probably, too well by many men, and, unless absolute prohibition is resorted to, no more practical distinction can be made."

Precisely the same distinction in principle is made in our own case of *Harrison* v. *State*, 96 Tenn., 548, 35 S. W., 559, in which the doctrine was announced of a distinction between wholesale and retail liquor dealing, based, not upon the amount or quantity sold, but upon

whether it was sold to be consumed, or sold to be again resold.

Our legislature for a century has distinguished between the wholesale and retail dealer, and for the most obvious reasons, and upon the plainest ground, to wit: Sales by dealers and manufacturers in quantities and packages, and not for consumption, do not furnish the occasion for disorder and disquiet that attends the sale in smaller quantities, to be consumed in saloons or public places.

We conclude that the exemption of manufacturers who sell in wholesale packages or quantities from the operation of the law does not render it invalid, when tested by either the constitution of the United States or of the State of Tennessee.

It is said, however, that, conceding the validity of the act, it cannot be held to deprive the defendant from exercising the privilege of selling intoxicating liquors during the life of a license granted him by the State for that purpose.

The charter of Union City was abolished on the 31st of March, 1903, by legislative enactment. The town was rechartered by an act of the general assembly on April 1, 1903. It had a population of more than 2,000 and less than 5,000 inhabitants. The license was issued on 26th of January, 1903, to be operative for one year. The sale was made within four miles of a schoolhouse, where school was kept, and accustomed to be kept, within the corporate limits of Union City, and on the 16th day of April, 1903.

On the one hand it is contended that it is is not the effect of the law of 1903 to cancel and

destroy an existing license to sell liquors, but the license continues until it expires by its own limitations, and that it was not the intention of the legislature to cancel existing licenses.

On the other hand it is contended that the effect of the law is to cancel and annul the license when the new corporation goes into operation, and that such was the intention of the general assembly.

In *Johnson* v. *State,* 3 Lea, 470, 31 Am. Rep., 648, it was held that the grant of a privilege to tipple, which might be exercised within an incorporated town, irrespective of its proximity to incorporated institutions of learning, did not include the right to do so upon the repeal of the charter of the town, nor preclude the legislature from repealing the charter of the town, nor change the results of such repeal. This case arose under the operations of the act of 1877. The case was decided upon the theory that the party was licensed to exercise the privilege subject to such reasonable police regulations as might be deemed necessary for the protection of the community; and it was said that by the terms of his license the defendant might keep a tippling house at any one place in Trousdale county, except that after the incorporation he could not keep it in the town of Hartsville.

This holding was reaffirmed in *Brinkley* v. *State,* 108 Tenn., 475, 67 S. W., 796, apparently upon the theory that, when the old charter was repealed, it put an end to the corporate life of the town, and, when reincorporated, that was the beginning of a new corporate life. Being, then, within the terms of the act of 1899,

the new municipality was from the beginning subject to the provisions of that act.

It is said, however, that it was not the intention of the legislature to cancel and render inoperative existing licenses, as appears from the fact that in the acts of 1877, 1887, and 1899 it was provided that they should not apply to sales made by persons having license to sell at the date of the passage of the several acts, and that this indicated a legislative policy not to interfere with unexpired licenses by the enactment of such laws. On the other hand, it is said the failure to keep up this protection of existing licenses by the act of 1903 indicated a change of State policy, and that existing licenses should be canceled. So that different inferences are drawn by the opposing counsel from this action of the general assembly.

Again, it is said that the only amendment made to the act of 1899 was to substitute the word "five" for the word "two" in designating the number of inhabitants required in the new town, and that the effect of the amendment was to continue in force the entire provisions of the act of 1899, exceptions and all, so that the act of 1903 should read as though it contained the same exception in favor of licenses in force at its passage as is contained in the act of 1899 as to licenses then in force.

On the other hand it is contended that the provision of the act of 1899 excepting licenses then in force expired by its own limitations when the licenses then existing terminated, so that this exception was not living law at the passage of the act of 1903, and did not become incorporated into it nor resuscitated by it.

Recognizing the force of the view taken by defendants, we are of opinion that the amendment made by the act of 1903 recognized the act of 1899 only so far as it was in force and effect at the date of the passage of the act of 1903, and no further, and the amendment merely continued the act with the substitution of "five," instead of "two," thousand, so that the act of 1903 became operative as to towns of less than 5,000 inhabitants, as it was with respect to towns of 2,000 inhabitants before the latter act was passed; but it did not reenact or revitalize a provision of the act of 1899 which had expired and had become obsolete by its own limitations before the passage of the act of 1903, nor did it substitute a new limitation for licenses for one which had already become extinct.

In other words, the act of 1899 was passed April 14, 1899, and excepted licenses then in force. None of these licenses could extend beyond April 14, 1900, and the act of 1899 should be so read that no sales could be made under then existing licenses after April 14, 1900, or earlier if the license sooner expired. Such a provision has no vitality after the limit fixed, and could have none unless revitalized by a provision to that purpose; and an act amending the act of 1899 only amended and continued the act as it was in existence and effect when the amending act was passed.

The act of 1899 saved only licenses then existing. The present license did not then exist, and could not be covered by its terms, nor could any other license not then in existence.

We cannot, in arriving at this conclusion, be con-

trolled by our conceptions of what might have been proper or politic upon this matter.

It may work a hardship, and no doubt will, to at once and summarily close up a business theretofore legalized and licensed; but this was a matter addressed to the general assembly, and not to this court.

It is a canon of construction that an amended statute is to be understood, as far as future acts are concerned, in the same sense as if it had read from the beginning as it reads when amended, but not to take effect retroactively, but only in the future.

The question is one of great difficulty, and there is great force in the view of the defense that the legislature did not intend to revoke licenses which had been granted to the injury of persons who had bought property, entered into business, and incurred liabilities on the strength of such licenses.

But on the other hand, we are unable to see how a dead and inoperative provision may be enforced, unless it is in some way revitalized and resuscitated. If the legislature had intended to protect existing licenses, it could easily have provided that they should be respected, as was done in previous acts. But it did not do so; and we are forced, from this fact, to hold that it did not intend to do so.

As to the defendant Heilbronner, it is not contended that he had any license, and hence, if he made the sale or assisted in it, he is guilty, since, the offense being a misdemeanor, aiders and abettors are guilty as principals. It is insisted for him that he has committed no offense; that he merely sold to defendant Webster liquors in the due course of his business as a wholesale

dealer. We are convinced from this record that he is the instigator of the entire matter; that he encouraged and induced Webster to enter into the business; that he, or his firm, furnished the money to conduct it and the liquors which were sold. It is shown that he went with the defendant Webster to the mayor to make negotiations with him to be allowed to open up for business, and, failing in this, notified the mayor that they (meaning Webster and himself) were going to commence the sale of liquors that day, and asked what the mayor would do about it; that he was present in and about the saloon when the sale was made; that he is chief beneficiary, as Webster is shown to be without property and the business really for the benefit of his firm and himself. He notified the mayor that he was going to "back up" Webster in the sale of liquor in Union City, and had plenty of money, and, when told that he could not lie in jail for him as the result of the sale of liquor, he replied that he would not object to it, and was cautioned by the mayor that such would be the probable result of his acts. Heilbronner did most of the talking, and Webster but little, except to assure the mayor: "We are going to give you a run for your money."

It does not matter that the sale was made in Webster's name. Under the facts, he was really the accomplice of Heilbronner, who was present, aiding and abetting. If Webster is guilty, so is Heilbronner. This is so legally, and still more so morally. *Atkins* v. *State,* 95 Tenn., 475, 32 S. W., 391; *Swift* v. *State,* 108 Tenn., 610, 69 S. W., 326; *State* v. *Bonner,* 2 Head, 136.

For the reasons stated, we are satisfied the conviction

of both Webster and Heilbronner is correct, and the judgment is affirmed, with costs.

There are several minor exceptions to testimony and charge, none of which are well made, and it is not necessary to pass upon them with formality.

The holding in this case is determinative not only of this case, but also of the cases of *State* v. *Roy Webster* and *State* v. *Samuel Redfearn;* the latter being an appeal from Hardeman county.

We are also of the opinion that in the Redfearn case the sale was not in course of ordinary business and for the purpose of prosecuting the same; but simply in order to test the legislation which had been recently enacted.

For these reasons the court is unanimously of opinion that neither of the defendants is protected by the licenses which they took out; but said licenses are an attempted fraudulent evasion of the law of 1903, and no authority or defense to the sales made, and the judgments are affirmed.

Chief Justice BEARD and Associate Justice SHIELDS do not concur with the majority in the construction of the act of 1903, but are of opinion the exception in the act of 1899 in favor of .existing licenses was intended to be, and was brought forward into and made part of the act of 1903; and the latter act was not intended and does not interfere with or vacate licenses taken out in good faith and in the usual course of business prior to the passage of that act. The defendants in each case will pay the costs of the case.